Raymond E. BUTLER, Appellant,

v.

UNITED STATES, Appellee.

No. 10330.

District of Columbia Court of Appeals.

Argued En Banc March 22, 1979.

Decided April 29, 1980.

Silas J. Wasserstrom, Public Defender Service, Washington, D. C., for appellant.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time of en banc argument, and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, KELLY, KERN, GALLAGHER, NEBEKER, HARRIS, MACK and FERREN, Associate Judges, and REILLY, Chief Judge, Retired, and YEAGLEY, Associate Judge, Retired.*

MACK, Associate Judge:

In this en banc proceeding reviewing criminal convictions, we have examined challenges to 1) the denial of a motion to suppress evidence and 2) the effective assistance of defense counsel who, prior to a hearing told the motions judge of his client's intention to commit perjury, and who permitted his client to go to a bench trial before the same judge.[1] Although the first issue presents a troublesome question in light of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we need deal

---

* Judge YEAGLEY was an Associate Judge of the court at the time of the en banc argument. His status changed to Associate Judge, Retired, on April 20, 1979.

1. Our initial decision issued by a division of this court was filed and vacated on January 12, 1979. See Appendix at p. 861.

here only with the second; we have concluded that appellant, as a result of developments following counsel's revelations to the court, has been prejudiced by errors of constitutional dimensions fatally infecting both the suppression hearing and the subsequent trial. We therefore reverse the convictions for assault on a police officer and carrying a pistol without a license (D.C. Code 1973, §§ 22–505(a), –3204), and remand for new proceedings.

The flavor of the proceedings is best conveyed by a lengthy chronological recitation of the facts.

Appellant was arrested on January 31, 1975, and counsel was appointed for him on February 1. Indictment followed on April 4, and counsel, on April 19 filed a motion to suppress. On September 25, 1975, the day set for the hearing on the motion to suppress, defense counsel asked leave for his client to address the court on preliminary matter. Thereupon appellant asked for the appointment of "another" counsel until such time as he could secure his own. He explained that he had been incarcerated since February and had experienced difficulty in communicating with present counsel—that is, that he had not had sufficient time to discuss his case. He added that he had written the Bar Association, the Public Defender Service and the court about his difficulty, that he understood that counsel was a busy man, but that he would appreciate having a counsel with more time.

Counsel addressed the court in return to say that, while he did not object to being removed from the case, he had talked to his client for an hour on the day of appointment, conferred with him for 30 minutes prior to a preliminary hearing, and filed the motion to suppress. The real reason for his client's complaints, he said, was the length of incarceration occasioned by the defendant's parole status. ["The evidence is such, Your Honor, that he's in violation of the parole even if he wins the case, because the Parole Board can determine that the defendant had a pistol on him . . . ."] Conceding that he had not visited the jail in "two, three, four months" counsel continued:

This is an open and shut case, Your Honor, where I talked for approximately two hours with the defendant, filed an appropriate motion, and there are one or two witnesses that are police officers, for the government, and this defendant's word against theirs as to an incident on the street that took about ten minutes to occur. It is not a case where you put character in evidence, because the defendant is on parole for a crime of moral turpitude, and he doesn't have an alibi because he was arrested on the scene and, to be frank, Your Honor, because I expect he wants to testify in this case he is concerned that I do not want to put him on the stand, because he's told me before that he had the pistol, and today for the first time he tells me that's not true.

I have explained to the defendant, Your Honor, that I cannot put him on the stand if I think he's committing perjury, without telling the Court.

To which the court replied:

Of course you can't. To do so would be a violation of the law and your professional ethics and responsibility. And I don't have any doubt in the world but that he represented to you that he had this pistol on him.

Now, based upon your change in your story, Mr. [Defense Counsel] can't put you on the stand after you told him that and testify that you didn't have it. It doesn't really make any difference anyway, if, as I understand the government's evidence in this case to be that the pistol was recovered from the small of your back. What difference does it make whether you say you had it or you didn't have it. Where did it come from? Out of thin air?

Thereafter in answer to the court's further inquiry as to what the case was about, the government's evidence was detailed by both counsel.

In the course of the discussion of the evidence defense counsel (noting that he would not be revealing these matters on the record but for the accusation of ineffective

assistance) spoke of his efforts to convince his client that if the suppression motion was unsuccessful, he would probably be convicted of the pistol charge [2] (a felony by virtue of a previous conviction) and that a plea of guilty to the pistol charge, in exchange for the government's waiver of allocution, would give him a stronger chance for concurrent time.

When appellant protested that the pistol charge stemmed from an illegal search, a long colloquy followed [3] during the course of which the court told the appellant that the law and the Constitution would not help him in the decision he had to make (i. e. whether to enter a plea of guilty), that if the motion went to a hearing and was denied, it was all over for him, that under these circumstances he would have nothing to bargain with, that a jury would see the pistol and he would then be in a "pickle." The court added that it thought the govern-

2. The defendant denied that he ever told counsel that he had a pistol and added:

And by you supposed to be representing me, you ain't supposed to make no statements such as that anyway.

3. THE DEFENDANT: Your Honor, the CPW stems from an illegal search; the assault stems from an illegal search.

THE COURT: Well, see, you're talking theory and I'm talking facts. You have been in jail since February; is that right?

THE DEFENDANT: Yes, sir.

THE COURT: What's the maximum you can get on a CPW?

[DEFENSE COUNSEL]: This is a felony I, Your Honor.

THE COURT: This is a felony?

MR. GILMAN: Yes.

THE DEFENDANT: It can be forty months to ten years.

THE COURT: What's the basis for it being a felony?

MR. GILMAN: Previous conviction of the same crime, Your Honor.

THE COURT: CPW?

MR. GILMAN: Yes, Your Honor. And I have an information which I shall file today, Your Honor, indicating that. I have copies for the counsel and defendant.

THE COURT: Phew!

[DEFENSE COUNSEL]: Your Honor, I have just tried to explain, I don't mind trying any case, but I'd rather take on the hardest murder case in the world and have a chance to win it than a simple pistol charge, because you either have it or you don't, and I have tried to persuade the defendant, and I wouldn't be revealing these things on the record but for the fact he's accused me of ineffective assistance of counsel.

THE COURT: Mr.—I believe your situation here—What you need now is some sane judgment. We all know what the law is and we all know what the Constitution is and all that, see, but that won't help you right now in the decision you got to make at this time. The question is do you want—see, because it's all over, really, when the motion is decided. You don't have anything to bargain with. It's all over then, the CDW and the APO.

THE DEFENDANT: For an illegal search, Your Honor, I should get some type of consideration, from the search being illegal itself.

THE COURT: Well, see, what I'm telling you now is, if the thing goes to hearing on the motion and the motion is decided against you, you put an end to it then, because you don't really have anything to work with at that point and the government knows it. What in the world are they going to make a plea bargain with you for? If I deny your motion to suppress the evidence, they've got the evidence, they've got the physical evidence and there it is in front of the jury.

What do you think they're going to do on CDW felony? Now, you know the law, I guess. You have come in here telling me about your rights and all about the law and the Constitution. Now, you seem like a smart man to me, but I know what juries will do. I haven't seen a case yet where you have that physical evidence on that pistol—I'm telling you right, Mr. Butler. I wouldn't tell you wrong for anything in the world. If this motion goes to hearing and it's denied, you really are in a pickle.

Now, you got some chance on that APO, see, because we all know the fact of the matter—juries go kind of slow on those things. We all know that. So, I don't know what they'll do if you got the APO and CDW at the same time. That doesn't look too good. The only thing they can see is that pistol and they're going to wave it all in front of them and take it in the jury room with them. I'm telling you what the facts of life are. I wouldn't give you a piece of wrong information for anything.

Now, you do what you want to do. We'll either hear the motion or dispose of it one way or the other, and I don't know what I'd do with the motion. I don't know what the facts are and have no way in the world for me to tell you what I'm going to do with the motion. I can't decide that until I've heard it, but I think, Mr. Butler, they offer you a pretty decent disposition under the circumstances and it would be well worth your while to take it.

ment had offered "a pretty decent disposition under the circumstances and it would be well worth your while to take it."

The court advised appellant that he must decide what he wanted to do. Appellant noted at one point, "I accept the counsel," and at another, "I want to go on with the trial." During this discussion the court explained that the officers could justify the warrantless search by showing that they had reasonable suspicion for a patdown, that reasonable suspicion "means almost anything, to tell you the truth" and that the advice of defense counsel was sound.[4]

Defense counsel, after a private conference with appellant, told the court that the problem was that the defendant did not trust him; he requested that the case be passed over until the following day and that another attorney be appointed that appellant might listen to. Counsel said he would be happy either to remain in or get out of the case, but that he hated to see appellant make the tragic mistake of going to trial. The court told appellant that he saw no reason to remove counsel, an abortive discussion followed as to the chances of appellant securing his own counsel, and the appellant then said he would accept the government's offer.[5] When the court began its Super.Ct.Cr.R. 11 inquiry, appellant again expressed reluctance, the court refused to accept the plea, and instructed the government to call its first witness for the purpose of hearing the motion to suppress. After testimony from one police officer de-

---

4. THE DEFENDANT: Well, I want to know what would justify reasonable suspicion.
 THE COURT: Well, see, therein lies the problem and, really, Mr. Butler, I've been asking the same question for years, and to tell you the truth, now you want me to tell you what reasonable suspicion means.
 THE DEFENDANT: I understood, Your Honor—
 THE COURT: It means almost anything.
 THE DEFENDANT: It means, sir—
 THE COURT: It means almost anything, to tell you the truth.
 THE DEFENDANT: Does it mean walking down the street like this. I wasn't near a car, so can't say I was near a car. Does that appear to be reasonable suspicion?
 THE COURT: It really doesn't. That much, Mr. Butler, is about the best thing I can tell you.
 THE DEFENDANT: This is what I got to say.
 [DEFENSE COUNSEL]: Your Honor, if it please the Court, I have tried to explain to Mr. Butler that if the police officer testifies that he saw Mr. Butler pop up from behind a car on a dark street, near midnight, and do something evasive, or look suspicious, and the Court believes the police officer as opposed to not believing the defendant's version, then that's justifiable reason to search for the pistol.
 THE COURT: You gave him sound advice.
 [DEFENSE COUNSEL]: And he seems to interpret—he disagrees with the officer's version and automatically thinks that any judge or jury is going to believe him. I have tried to explain to him the practicalities of the police officer's testimony.
 THE COURT: See, he knows more about this case than I do. But his advice, as I hear it, is sound.
 Now, you do what you want to do.

5. THE COURT: Really, I don't know what your problem is. You have been sitting over there since February, sitting in jail; right?
 THE DEFENDANT: Yes, sir.
 THE COURT: Is that right?
 THE DEFENDANT: Yes, Your Honor.
 THE COURT: You got this thing hanging over your head; right?
 THE DEFENDANT: Yes, Your Honor.
 THE COURT: And you got the parole situation hanging over your head.
 THE DEFENDANT: Yes, Your Honor.
 THE COURT: Now, you got to get on the road some kind of way, got to get ahead somewhere. You're just deadtiming over there. You're headed nowhere right where you are just sitting in jail. How much time can you do on it?
 THE DEFENDANT: I was told I can do ten years.
 THE COURT: Yes, you can do ten years on it. You can do ten years in D.C. jail, too.
 THE DEFENDANT: I understand that, Your Honor.
 THE COURT: Waiting on it. The question is what you want to do. You got to, you know, be practical about these things, Mr. Butler. There's some you make a stand in and some you don't, and if I were in your circumstances I wouldn't have any hesitation to go ahead and dispose of it. But you got to decide that for yourself.
 THE DEFENDANT: All right, Your Honor, I'll accept the government's—
 THE COURT: You'll accept the government's offer, will you?
 THE DEFENDANT: Yes.
 THE COURT: Is that what you want to do, Mr. Butler? Is that your determination now?
 THE DEFENDANT: Yeah, my determination.

scribing appellant's apprehension [6] the motion for suppression was denied and a trial date set.

Trial was scheduled for October 28, 1975 before the same judge who had heard the motion to suppress. On that morning counsel and the court disposed of preliminary matters while waiting for appellant to be brought to court. Defense counsel told the court that "we intend" to have a nonjury trial which he anticipated, because of stipulations, would take no more than ten minutes. After counsel spoke to evidentiary matters, defense counsel, in answer to the court's inquiry, indicated that he did not think his client would take the stand:

> I explained the problems with the Court the last time regarding whether or not he was telling the truth about having the pistol. So I reserve stating what I'll do until he gets here and let him make the decision but I don't think he will take the stand.

Counsel explained he had taken this approach because he had assured appellant that this way he would still have an appeal and that the court would assist him in getting an attorney.

The court spoke of its recollection that appellant had at least one prior conviction. Government counsel recited all prior convictions: attempted robbery in the United States District Court, possession of implements of crime in 1970, and carrying a pistol without a license in 1971. Defense counsel indicated, upon inquiry from the court, that he would not have any difficulty with those convictions in the event appellant took the stand.

When the case was called for trial, defense counsel stated for the record:

> We are going to have just a trial by the Court. I have spoken to Mr. Butler Friday, he was in agreement with that advice at that time and again this morning at about 9:15, at that time Mr. Butler indicated he would prefer that we go to trial before Your Honor.

> ' * * * * * *

> I have advised Mr. Butler that the court will assist him . . . in getting . . . a very competent attorney to handle his appeal. . . .

Thereafter, a written waiver of trial by jury was executed. The testimony of the officer who had appeared at the pretrial motion was admitted by stipulation. Two other officers testified to identify the pistol and give details of the assault charge. Motions for a judgment of acquittal were denied, the defendant elected not to testify, and the defense rested.

In closing argument, defense counsel speaking first "to save the court time," stated *inter alia*:

> Your Honor, being as honest about it as I think we can be in this case, I think this is a case which will pivot upon whether or not Your Honor was correct or incorrect in not suppressing the pistol at the September 25th motion to suppress.

> * * * * * *

> In regard to the assault on the police officer, I would submit on the argument I made on the judgment of acquittal [that the defendant was entitled to meet force with force if the police officer was not performing his duties in good faith]. With that, I'd ask the Court to find the defendant not guilty if Your Honor disbelieves the Government's testimony.

The court did not hear from the government and found the defendant guilty on both counts.

## I.

A central, and rather startling factor, at first blush, raises complex issues in an unusual factual context. In a prehearing setting, defense counsel has told a motions judge who (apparently as a result of counsel's advice to his client) has ultimately become the trier-of-fact, of the merits of his client's case and the fact that his client intends to commit perjury. In this court we are asked—does counsel's conduct

---

6. Defense counsel did not call his client to testify but suggested that the court ask him if

he wished to be heard. The court did not do so.

amount to ineffective assistance of counsel under the Sixth Amendment? The government argues that the fact that counsel was faced in the pretrial setting with the accusation of having rendered ineffective assistance of counsel precludes our finding here that counsel's performance amounted to reversible error in the absence of prejudice. A skillful analysis is made pointing to the conflict that a lawyer faces in protecting his client's confidences and at the same time responding to an allegation of ineffectiveness. We would remind, however, that a lawyer likewise may face a conflict in protecting his client's confidences and in refraining from lending support to what he (or she) believes to be false testimony. The first described conflict is a matter of first impression here; the second is not.

The protection of a client's confidence is so basic a tenet of professional responsibility that it yields only in the rarest of real ethical dilemmas. Thus in such a dilemma, advice, disassociation, and even passive representation, may be resorted to in lieu of exposure.[7] These are the accommodations suggested by the ABA Standards for Criminal Justice: Defense Function (Approved Draft, 1971), under circumstances where a defendant has admitted to his lawyer facts which establish his guilt, the lawyer's independent investigation establishes the admissions are true, but the client insists on his right to trial. Standard 7.7 provides that the lawyer must advise his client against taking the stand to testify falsely, but that if the defendant insists that he will do so the lawyer must withdraw if feasible. The Standard continues:

(c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, it is unprofessional conduct for the lawyer to lend his

aid to the perjury or use the perjured testimony. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not recite or rely upon the false testimony in his closing argument.

The Standard has been discussed in appeals urging that there was ineffective assistance of counsel at trial.

In *Thornton v. United States*, D.C.App., 357 A.2d 429, *cert. denied*, 429 F.2d 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), we gave approval to the trial tactics of a lawyer who, knowing his client was taking the stand to commit perjury, and having been denied the right to withdraw, restricted his representation to the recommendations of the ABA Standard.

In *Johnson v. United States*, D.C.App., 404 A.2d 162 (1979), we spoke to the degree of certainty (of proffered false testimony) that is required before a lawyer may claim a dilemma. We quoted the commentary to Standard 7.7:

The existence of this dilemma is predicated upon the defendant's admitting inculpatory facts to his lawyer which are corroborated by the lawyer's own investigation. So long as the defendant maintains his innocence, the lawyer's realistic appraisal that he is in fact guilty does not preclude a vigorous defense. [*Id.* at 164 n.2.]

---

7. Some commentators have questioned whether an attorney representing a defendant in a criminal case may ever disclose his client's intention to commit perjury. *See United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 n.13 (3rd Cir. 1977), citing Michael Callan and Harris David, *Professional Responsibility and*

*the Duty of Confidentiality: Disclosure of Client Misconduct in an Adversary System*, 29 Rutgers L.Rev. 332 (1976). M. Freedman, Lawyers' Ethics in an Adversary System (1975). *Cf.* ABA Code of Professional Responsibility— DR 4–101(C)(3).

850

We held in *Johnson* that an inconsistency between two proffered defenses was insufficient to establish that the intended testimony was false. In reversing a conviction on the ground that the trial court improperly imposed the restrictions of Standard 7.7 upon defense counsel, we noted:

Section 7.7 speaks to a situation in which the falsity of the defendant's testimony is known and not merely suspected. Likewise, our previous cases in which this problem arose involved situations in which the attorney knew, based on independent investigation of the case or on prior discussions with the client, that the defendant's testimony was false. It was in that context that we held that the attorney could, consistent with the defendant's right, limit his or her representation in accordance with § 7.7. *Thornton v. United States, supra; Herbert v. United States*, D.C.App., 340 A.2d 802, 804 (1975); *see also United States ex rel. Wilcox v. Johnson*, 555 F.2d 115 (3d Cir. 1977). Where as here, the veracity or falsity of the defendant's testimony is conjectural, the ethical dilemma does not arise. [*Id.* at 164 (footnote omitted).]

Both *Johnson* and *Thornton* involved cases tried before juries. Of interest, therefore, is the reasoning of the Ninth Circuit in a case where the spectre of false testimony arose in the context of a bench trial. *Lowery v. Cardwell*, 575 F.2d 727 (9th Cir. 1978). The court held in *Lowery* that defense counsel's motion to withdraw (without stating a reason) coupled with his passive representation in accord with Standard 7.7 was such an unequivocal announcement (of counsel's belief of perjury) to the factfinder as to deprive the defendant of due process. (Judge Hufstedler, specifically concurring would have rested the decision on the denial of Sixth Amendment right to effective assistance of counsel.) The court said:

We start with the basic proposition that if, under these circumstances, counsel informs the fact finder of his belief he has, by that action, disabled the fact finder from judging the merits of the defendant's defense. Further, he has by his action openly placed himself in opposition to his client upon her defense. . . . If in truth the defendant has committed perjury (a fact we do not know in this case) she does not by that falsehood forfeit her right to fair trial. [*Id.* at 730.]

The court found that its result was not inconsistent with ethical standards and would not expose counsel to subornation of perjury. It noted, *inter alia*, that the ABA Standards did not deal with a trial had before a judge without a jury: "The Standards seem quite sensibly to assume that counsel will not be expected to act in such a fashion as to disclose his quandary to the fact finder." *Id.* at 731 (footnote omitted).

It is safe to say therefore that the courts which have weighed the dilemma of a defense counsel, faced with the unenviable position of representing a client whom he knows will commit perjury, have approved (for jury trials at least) the recommended accommodation of the ABA Standards which meets both ethical requirements of protecting clients' confidences and refraining from wrongdoing. The lawyer is permitted to let his client tell his own story and is insulated from a subsequent charge of ineffective assistance of counsel. We are persuaded that this approach is the preferable one and we reaffirm the implicit holdings of *Thornton* and *Johnson* that defense counsel, when in possession of substantial facts indicating that his client is going to give perjured testimony before a jury, may, consistent with effective representation, follow the recommended procedures of Standard 7.7.

As to the instant case, it should be noted initially that the record does not support an inference that defense counsel *knew* that his client was going to commit perjury. Counsel raised the issue with the court at the pre-motions hearing stage "because I expect he wants to testify in this case" and "because he's told me before that he had the pistol, and today for the first time he tells me that's not true." At that point in time counsel knew only that his client had made inconsistent representations to him about the possession of the gun. He ad-

vised appellant that he could not commit perjury but he also advised the court that he had done so and why. We think he unnecessarily betrayed the confidences of his client, a factor having serious consequences in view of what was to follow.[8]

But it is argued that the fact that counsel was reacting to a challenge to effective assistance of counsel at the pretrial stage makes a difference. The government, relying on our decision in *Monroe v. United States*, D.C.App., 389 A.2d 811, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), defends counsel's position as having been merely responsive to the inquiry of the court.

In *Monroe* we held that "a trial court's primary duty under the Sixth Amendment when confronted with a pretrial claim of inadequate preparation and consultation by counsel is to decide whether counsel has consulted with the defendant and prepared his case in a proper manner." *Id.* at 819. We held that the court must conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations and that it must make "findings of fact *of record* [emphasis in original] sufficient to permit meaningful appellate review on the issue of the *ability* and *preparedness* [emphasis added] of counsel to render effective assistance . . . ." *Id.* at 821. *See also Farrell v. United States*, D.C.App., 391 A.2d 755 (1978). Nothing that we said in *Monroe* can be read as suggesting that the trial court in assessing the capability and preparedness of counsel can inquire into the merits of the defense or the substance of the defendant's testimony or that defense counsel may ethically address such issues. Indeed, subsequently in *Johnson, supra*, we questioned the propriety of a court's requesting a proffer of defense (even where trial was had by jury), and with respect to the court's surmise that the defendant was about to commit perjury, we said, "if the trial court were to fully inquire into the matter, it would necessarily touch upon privileged attorney-client communications." *Id.* at 164. *Monroe, supra*, intended as a shield for an accused, would become a sword if interpreted in such manner as to permit the betrayal of the confidence of one who has sought its protection. The effect of such an interpretation would be to deter defendants from raising legitimate claims of ineffective assistance of counsel.

The government argues, however, that a hearing on alleged incompetence of counsel, whether held before or after trial, has inherent adversary characteristics and that counsel cannot fairly be expected to resolve every doubt as to necessity for disclosure in favor of a client who has challenged counsel's performance. We are told that the issue as to how much counsel may say under such circumstances is not an easy one and that even if one or more of the remarks were precipitous and unnecessary, we should not reverse appellant's conviction on the ground of ineffective assistance of counsel unless the record demonstrates that appellant was prejudiced by counsel's actions.

We find little difficulty in demonstrating on this record the precise point at which counsel should have stopped. However, even if we were to assume the validity of the government's argument, the issue of prejudice cannot be assessed without taking into consideration the events which subsequently transpired. Had defense counsel requested that the court disqualify itself and that the case be certified to another court for hearing and trial (and had such request been granted) there would be no need for such inquiry. He did not do so and we find that the cumulative effect of the

---

8. In *United States ex rel. Wilcox v. Johnson, supra* at 122, the Third Circuit noted:

> It is essential to our adversary system that a client's ability to communicate freely and in confidence with his counsel be maintained inviolate. When an attorney unnecessarily discloses the confidences of his client, he creates a chilling effect which inhibits the mutual trust and independence necessary to effective representation. It is apparent that an attorney may not volunteer a mere unsubstantiated opinion that his client's protestations of innocence are perjured. To do so would undermine a cornerstone of our system of criminal justice.

actions taken by counsel[9] and the court has deprived appellant of due process in violation of the Fifth Amendment.

## II.

The essence of the judicial role is neutrality. *Byrd v. United States*, D.C.App., 377 A.2d 400, 404 (1977). A trial judge "must remain a 'disinterested and objective participant in the proceeding' " and "[o]nce his neutral position has been jeopardized, the judicial evenhandedness that should pervade the courtroom disappears and 'the right to a fair trial may be imperiled.' " *Haughton v. Byers*, D.C.App., 398 A.2d 18, 20–21 (1979) (citations omitted).

 It is difficult to imagine how the neutrality of a judge could remain free from compromise when it had been told by defense counsel that the government's case can be proved beyond a reasonable doubt and that the defendant intends to commit perjury. When the court has regard for the ability and honesty of the lawyer, as the court apparently did here, the credibility of the defendant would necessarily suffer in direct proportion to such regard. Under such circumstances recusal and certification, to another court is the desired procedure (*see Thornton, supra*) and we hold that it is mandated. Error in failing to do so is compounded when the judge sits as the trier-of-fact. The due process clause commands fundamental fairness in factfinding. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 554, 91 S.Ct. 1976, 1990, 29 L.Ed.2d 647 (1971).

 The trial court in this case expressly indicated at the prehearing stage its belief that the defendant had changed his story: "And I don't have any doubt in the world but that he represented to you that he had this pistol on him." "Now based upon your change in your story, Mr. [Defense Counsel] can't put you on the stand after you told him that and testify that you didn't have

it." Moreover, the court not only shared the view of defense counsel as to the facts but also as to the best defense strategy, affirming his belief in the good judgment of counsel again and again. And although the assessment may have been both right and well-intentioned (and the course followed thereafter borne out of compassion), it is clear that the active role of the court, in trying to convince the defendant that he should follow counsel's advice to enter a plea of guilty to the pistol charge, was improper.

In *Byrd v. United States, supra,* we remanded a case with directions that a defendant's motion to withdraw a plea of guilty be granted under circumstances where the record showed that the trial court went beyond permissible bounds in encouraging that plea. We noted in that case that while the appellant would undoubtedly have a difficult time convincing a jury of his innocence based on the nature of his defense, "[i]t is, however, appellant who runs the risk of conviction and it is appellant who must decide, preferably after consulting with counsel, whether he wishes to have the jury finally determine his guilt or innocence" and that "whatever may be said of the wisdom of appellant's plea, consideration of fundamental fairness must control . . . ." *Id.* at 405. We cautioned that the trial court's remarks in a Rule 11 situation must not cross the fine line that demarcates advice from coercion. *Id.* at 404.

The trial court's remarks in the instant case are similar to those made in *Byrd*—the folksy advice about the "facts of life," the references to the strength of the government's position, the speculation as to the length of incarceration, the chances of defendant's prevailing on the motion to suppress or at trial before a jury if he did not enter a plea—all interposed with admonitions that the decision was one for the defendant and the judicial assessment that

9. We note that in *United States v. Joslin*, 140 U.S.App.D.C. 252, 434 F.2d 526 (1970), the failure of defense counsel (whom the defendant had previously requested to be replaced for allegedly not acting in defendant's best inter-

est) to support the defendant's request to withdraw a plea of guilty, was held to constitute inadequate assistance of counsel warranting a remand for a new hearing on the request.

the government had made a good offer. Government counsel has candidly admitted that if a plea had been entered in the instant case, the plea would be vulnerable to challenge. But the plea was not entered and the judge, who had told the defendant that reasonable suspicion "means almost anything," sat to hear and deny the motion for suppression. This was hardly the "fair" hearing by a "neutral and detached magistrate" required for the adjudication of Fourth Amendment claims. *See Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1948) quoted in *Gerstein v. Pugh*, 420 U.S. 103, 112–13, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975). Moreover, the same judge, who had told the defendant that a decision against him on the motion "put an end to it . . .," then sat to hear the evidence and to enter judgments of conviction without bothering to hear closing argument by government counsel.

We are mindful of the fact that the trial court recited its reasons for denying the motion to suppress and that it recited at trial that the government had established each and every element of each offense beyond a reasonable doubt. The government has urged that "absent a clear showing of substantial prejudice, a bench trial judge is presumed to have considered only relevant and admissible evidence in reaching his findings" *citing, inter alia, United States ex rel. Placek v. State of Illinois*, 546 F.2d 1298, 1302 (7th Cir. 1976). Yet, the destruction of the appearance of impartiality is so prevalent on this record as to strain any such presumption beyond the breaking point. And the substantial prejudice is apparent. In critical stages of these proceedings, appellant has been deprived of proce-

dural safeguards—the right to fundamental fairness of process.[10]

The degree to which our race for technology has invaded the criminal law is mirrored in the government's written argument that "[to] the extent . . . that counsel reasonably concluded that trial in this case served only to preserve the legal issue on which his client's prospects depended, the importance of the judge's role as factfinder was, as a practical matter, greatly diminished." This comment highlights, in the context of this case, another balancing act (if not a conflict) faced by defense counsel—the duty to know and apply technical skills and the duty to faithfully *represent* his client—even when he cannot win. The former is of course of the utmost importance, but when it is used in derogation of the latter, it may herald dire consequences for our system of justice. In this age of plea bargaining, the option of going to trial before an impartial factfinder must be kept open. If it is not, then the man or woman presumptively having the mentality to control the conduct leading to a criminal accusation in the first instance is foreclosed from exercising that mentality to maintain any manner of control over the right of defense guaranteed by the Constitution.[11] Then arrest and indictment may mark the end of the road and a computer could take it from there.

We hold here, that once defense counsel had informed the court of the merits of his client's case and the fact that his client intended to commit perjury, the proceedings should have been certified to another judge. The failure to do so has deprived the appellant of due process.

*Reversed and remanded.*

10. Counsel for appellant in this court has put the matter well:

 While it may well be that the *outcome* of hearing and the trial would have been precisely the same if the appellant had been represented by trusted and faithful counsel diligently pursuing his client's interests, and had been tried by a court properly performing its judicial function, the *process* surely would have been completely different, even if the result—conviction—would have been the

same. But process—procedure—is what much of our constitutional law is all about.

11. The facts of *United States ex rel. Wilcox v. Johnson, supra*, illustrate "The Case of the Presumptuous Counsel" who chose a defense (without first consulting the client) and who prevailed (with the help of the trial court) in pursuing this defense after threatening to withdraw if the defendant insisted on testifying. A petition for a writ of habeas corpus was granted and the order affirmed.

GALLAGHER, Associate Judge, with whom YEAGLEY, Associate Judge, Retired, joins concurring in part, dissenting in part:

I join Judge Ferren's concurring and dissenting opinion, except that I do not join him on his discussion in footnote 4. I view that discussion as unnecessary to the opinion and believe it should be left to another day when such an issue is presented on a concrete record.

FERREN, Associate Judge, concurring in part and dissenting in part:

In this case, prior to trial, appellant asked the court to appoint another lawyer to represent him. While not objecting to removal from the case, counsel for appellant defended his representation to date. In doing so, he informed the court—which ultimately became the trier of fact—that "[t]his is an open and shut case," and that his client intended to commit perjury.

I agree that the conviction should be reversed and the case remanded for a new trial. For the reasons stated in Part II of the court's opinion, it is inconceivable to me

that due process could be satisfied when the defendant's own lawyer tells the trier of fact that the defense has no case and his client plans to take the stand and lie. Accordingly, after ruling on the client's request for new counsel, see Thornton v. United States, D.C.App., 357 A.2d 429, cert. denied, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), the judge should have recused himself from further participation.[1]

I cannot agree, however, with the premise in Part I of the court's opinion that the lawyer's duty to protect client confidences limits the lawyer's right to defend against a client's accusation of ineffectiveness under the circumstances presented here. The trial court has a duty to conduct a thorough, on-the-record inquiry into a pretrial claim of ineffective assistance of counsel. Monroe v. United States, D.C. App., 389 A.2d 811, 820–21, cert. denied, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); accord, Farrell v. United States, D.C.App., 391 A.2d 755, 760–61 (1978). Correspondingly, the attorney has wide latitude to defend himself or herself against a client's accusation. See ABA Code of Pro-

1. There is an obvious question: how does this situation differ from one in which a judge grants a pretrial motion to suppress and then tries the case without a jury, aware of powerful incriminating evidence supposedly to be ignored? In a case in which damaging evidence is suppressed by a trial judge who later sits as the finder of fact, this court can review the record to determine whether the evidence properly admitted was sufficient to support a verdict of guilty. But in a case such as this, if the trial judge improperly considers the attorney's suggestion of the defendant's possible perjury in weighing the credibility of witnesses and determining guilt, we cannot effectively screen such bias on appeal. Moreover, in a suppression case, the client and lawyer presumably have an effective working relationship, such that any concern about the motions judge sitting as trier could be resolved by a jury demand. In the present case, however, given the particular disclosures by defense counsel, the relationship between client and lawyer had deteriorated to the point where the court could not properly have left counsel in the case, and thus the client effectively had no counsel sufficiently concerned about him to make a timely jury demand for purposes of insulating the trier of fact, if necessary, from assertions about an "open and shut case" and possible perjury.

Because a trial judge, in sentencing, legitimately may consider possible perjury, see United States v. Grayson, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), it is possible that even a jury trial would not protect a testifying defendant against a trial judge who conducted the pretrial inquiry into an ineffectiveness of counsel claim, remained in the case, and, suspecting perjury (based solely on what the judge heard before trial), eventually imposed an especially harsh sentence—even though the defendant may, in fact, have told the truth. See Johnson v. United States, D.C.App., 404 A.2d 162, 164 (1979) ("We agree with appellant that the inconsistency between his two proffered defenses was insufficient to establish that the second proffer, the intended testimony, was false and that the trial court's conclusion to the contrary was based on surmise"). Thus, there are likely to be instances when the motions judge who conducts the ineffectiveness inquiry should transfer even a jury trial to another judge.

Finally, I can imagine situations in which the motions judge should transfer the case when possibly prejudicial information has been disclosed, even though he or she properly declines to vacate counsel's appointment.

fessional Responsibility, DR 4–101(C)(4).[2] Given a threat to the attorney's reputation and the right to respond under DR 4–101(C)(4), it is unrealistic for this court to attempt to place limitations on the scope of the trial court's inquiry and the attorney's response.[3] How can an attorney under fire reasonably be expected to hold back anything which, in his or her judgment, may be helpful in defending against the client's allegations? By what criteria should the propriety of the attorney's response be judged? And, with the defendant's interest in mind, if the trial court cannot "inquire into the merits of the defense or the substance of the defendant's testimony," *ante* at 851; note 3 *supra*, how can we be sure that the trial court can conduct the necessary *Monroe-Farrell* inquiry into an alleged irreconcilable conflict over the conduct of the trial? Even if it were possible in some instances of a *Monroe-Farrell* inquiry for the trial court and counsel to probe improperly into the merits of a criminal case, this court has not sorted out that issue in a way that provides clear enough guidance.

I can think of only one reason for attempting to limit the pretrial colloquy on the alleged ineffectiveness of counsel: a concern that the price of asserting a constitutional right should not be a willingness to risk that the trier of fact, whether judge or jury, will learn damaging information about the defendant which otherwise would remain confidential. I share that concern, but cannot agree with the court's approach to it. I fear that any effort to limit the *Monroe-Farrell* inquiry may, in itself, chill effective assertion of the Sixth Amendment right to counsel and prevent trial judges from properly resolving those claims. *See* note 3, *supra*. Therefore, rather than par-

tially gag the trial court and counsel during the pretrial inquiry, I would deal with the problem by formally requiring that, once the trial court has resolved the ineffectiveness claim after a full hearing and transferred the case, neither the recused judge, the deposed attorney, the prosecutor, nor anyone else who was privy to the *Monroe-Farrell* inquiry can be subpoenaed to testify against the defendant.

It is true that, in bringing the ineffectiveness claim, the defendant must be deemed to have waived the lawyer-client privilege "so far as necessary to defend the attorney's character." *West v. Solito*, 563 S.W.2d 240, 245 n. 3 (Tex.1978); *see Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974), *cert. denied*, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975); 8 Wigmore on Evidence § 2327 at 638 (McNaughton ed. 1961). But this does not mean that the defendant has waived the privilege for all purposes. The attorney's right to defend his or her conduct under DR 4–101(C)(4) to the point of revealing a client confidence is an exception to the rule that the lawyer-client privilege is for the benefit of—and can only be waived by—the client. *See Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal.1978). Thus, absent a manifest intention by the client to extend the waiver beyond the *Monroe-Farrell* hearing, no client confidence revealed at that hearing can properly be disclosed to the trier of fact. *See Bucks County Bank & Trust Co. v. Storck*, 297 F.Supp. 1122, 1123 (D.Hawaii 1969) (testimony by client at hearing on motion for return of property taken by allegedly illegal search and seizure

**2.** DR 4–101(C)(4) provides:
 (C) A lawyer may reveal:
 \* \* \* \* \* \*
 (4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct.
 ABA Code of Professional Responsibility (as amended 1977) (footnotes omitted).

**3.** Specifically, I believe the following statement in the majority opinion, while perhaps not trou-

blesome in most instances, may chill the inquiry and response to the point of jeopardizing the assertion of some pretrial ineffectiveness claims:

 Nothing that we said in *Monroe* can be read as suggesting that the trial court in assessing the capability and preparedness of counsel can inquiry into the merits of the defense or the substance of the defendant's testimony or that defense counsel may ethically address such issues. [*Ante* at 851.]

does not constitute general waiver of attorney-client privilege and cannot be used "in the criminal case in chief"); *cf. Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978) (en banc) (only a limited waiver of the attorney-client privilege occurred in a separate and nonpublic SEC investigation).[4]

In summary, I believe, under the circumstances of this case, that the best way to protect a client's Sixth Amendment right to effective assistance of counsel, as well as the only way to preserve a lawyer's rights under DR 4–101(C)(4), is to permit an unlimited inquiry during the *Monroe-Farrell* hearing, coupled with assurance that disclosures of client confidences at that hearing will be withheld from the new trier of fact.

REILLY, Chief Judge, Retired, with whom NEBEKER and HARRIS, Associate Judges, join, dissenting:

I am disturbed by the grounds relied on by the majority in reversing the conviction in the case before us. At issue is the conduct of a lawyer who, when asked for comment on a request for appointment of new counsel by a defendant charged with possession of a handgun, explained to the court that his client's real dissatisfaction with his representation was that he had advised the defendant that he would not put him on the stand to deny possession of the gun, as he was aware from his client's previous admission to him that such testimony would amount to perjury.

When this case was originally argued before a division, Judge Harris and I—Judge Mack dissenting—voted to affirm the conviction, pointing out that since it is the duty of a trial judge when a defendant makes a pretrial challenge to the effectiveness of counsel "to conduct an inquiry to determine the truth and scope of defendant's allegations," *Monroe v. United States*, D.C.App., 389 A.2d 811, 820 *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Thornton v. United States*, D.C.App., 357 A.2d 429, *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), defense counsel was obliged to acquaint the court with facts sufficient to enable it to make an informed judgment. Hence we concluded that under the circumstances confronting counsel here, his disclosure of defendant's real motive was not a valid reason for setting aside the conviction.[1]

In thus disposing of the case, we did not find it necessary except for a brief footnote reference to discuss the express limitations

4. Once a case has been transferred to a new judge after a *Monroe-Farrell* hearing, the question whether evidence from that hearing can properly come before the trial court will not only arise in connection with the government's case-in-chief. There is a related question: should the same rule apply, barring evidence from the *Monroe-Farrell* inquiry, if the defendant takes the stand and government counsel wishes to subpoena the motions judge or former counsel to provide impeachment testimony? I believe, as a general rule, the answer should be yes; otherwise, the chill on a defendant's rights to assert ineffectiveness of counsel and to testify in his or her own behalf would be too great. Nonetheless, the approach might be less absolute in the impeachment context. If, for example, at the *Monroe-Farrell* hearing, the defendant were unambiguously to confirm his or her counsel's assertion that a particular story would be perjurious, but then tell that very story later, before a new trier, the purpose of the privilege would be subverted were impeachment not to be permitted. Courts have indicated that the privilege may not be invoked under circumstances where "fairness" does not permit it. *See United States v. Catalanotto*,

468 F.Supp. 503, 506 (D.Ariz.1978) (quoting Wigmore, *supra*, to effect that: waiver of attorney-client privilege involves two elements: (1) does the person holding the right to claim the privilege intend to waive it? (2) is it fair and consistent with the assertion of the claim or defense being made to allow the privilege to be invoked?); *Pratt v. State*, 39 Md.App. 442, 448, 387 A.2d 779, 783 (1978), *aff'd*, 284 Md. 516, 398 A.2d 421 (1979) (in determining whether attorney-client privilege has been waived, "various factors such as the client's intent to waive, fairness, and consistency of conduct must be considered in view of the purpose of the privilege"). In any event, I would condition impeachment under all circumstances on a showing that, before the *Monroe-Farrell* hearing, the defendant had been alerted to the criteria by which confidences revealed at that hearing could be used for impeachment at trial.

1. As the divisional decision was never published in *Atlantic 2d*, the full text of the majority and minority opinions is annexed hereto as an appendix.

on the attorney-client privilege set forth in the Code of Professional Responsibility imposed by this court upon all lawyers practicing in this jurisdiction, although the relevant provisions of such Code would have reinforced our position. I refer particularly to the following excerpts from the disciplinary rule (DR 4–101) mandating the preservation of the confidences of a client:

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

(C) A lawyer may reveal:

\* \* \* \* \* \*

(3) *The intention of his client to commit a crime and the information necessary to prevent the crime.*

(4) Confidences or secrets necessary to establish or collect his fee or *to defend himself or his employees or associates against an accusation of wrongful conduct.* (Footnotes omitted; emphasis supplied.)

Nowhere in the text of the plurality opinion can any discussion of DR 4–101(C)(3) and (4) be found. As I read that opinion, it holds that in any criminal prosecution a defense counsel who reveals to the court the defendant's intention to give false testimony improperly betrays the confidences of his client. Having adopted this view, the opinion sets aside the conviction on the premise that such disclosure deprived appellant of his constitutional right to due process of law. It is plain that such conclusion flies in the face of those provisions of the very rule promulgated by this court to govern the conduct of lawyers with respect to privileged communications.

Perjury is of course a crime in this jurisdiction.[2] Thus it is apparent that if a defendant tells his counsel that despite his advice, his own trial strategem is to deny falsely under oath the commission of the act with which he is charged such defendant has an "intention . . . to commit a crime." It is equally apparent that the best way of providing "the information necessary to prevent the crime" is timely disclosure to the trial judge before the perjured testimony is actually offered.

In its opinion, the plurality comments upon the "ethical dilemma" confronting a defense counsel when his client confides to him an intention to commit perjury. This is not a dilemma over which counsel needs to agonize, however. The course for any lawyer aware of the relevant disciplinary rule previously quoted is precisely the one taken by counsel in this case. Indeed, had counsel been afforded an opportunity to engage in any research on the meaning of the rule, it is difficult to see how he could have made any other choice. While the text of DR 4–101(C) is couched in words which make disclosure of a confidence permissible rather than mandatory, *i. e.,* "A lawyer *may* reveal:"—a footnote to subsection 101(C)(3) cites one situation where a lawyer *must* disclose:

ABA *Opinions* 314 (1965) . . . indicate[s] that a lawyer must disclose even the confidences of his clients if "the facts in the attorney's possession indicate beyond reasonable doubt that a crime will be committed."[3]

It is submitted that this is the exact situation in which appellant's counsel found himself. I do not understand my colleagues' statement that "the record does not support an inference that defense counsel knew that his client was going to commit perjury." The opinion says that he "knew only that his client had made inconsistent statements to him about the possession of the gun." This is not completely accurate. It appears from what counsel

2. D.C.Code 1973, § 15–101.

3. This footnote (16) appears in the annotation to the Code of Professional Responsibility published by the District of Columbia Bar after this court had incorporated the Code into its disciplinary rules.

said to the court that he also knew the police version of the incident—which was consistent with his client's original private admission, that the defendant had expressed dissatisfaction with counsel's plan of not putting him on the witness stand, and that such dissatisfaction prompted defendant to demand a change of counsel. Counsel was aware that if he withdrew or was removed from the case the only obstacle to the accomplishment of defendant's scheme of trial tactics would have been cleared away. In short, while counsel may not have been able to predict with certainty what the defendant would say on the witness stand, were a new lawyer appointed, he was privy to "the intention of his client,"[4] which was all that the applicable rule required.

The plurality opinion also disregards the thrust of DR 4–101(C)(4), which permits a lawyer to reveal a confidential communication "to defend himself . . . against an accusation of wrongful conduct." It can scarcely be doubted that charges of neglect of a client's interest and inadequate preparation for trial amount to an accusation of professional misconduct. Yet we are told that when counsel here felt compelled to resort to such disclosure in order to defend himself, he deprived his client of due process by failing to move the court to disqualify itself and certify the case to another judge for trial because the revelation was prejudicial to his client.

According to the opinion, had counsel in this case adopted this course of action (assuming such motion was granted) "there would have been no need for such inquiry" [*i. e.*, an inquiry into the merits of a request for new counsel]. This conclusion not only ignores the fact that whatever prejudice to the defendant occurred here was self-inflicted, but also our holding in *Thornton v. United States, supra,* that it is error for a judge before whom a motion for counsel withdrawal was pending to direct a second judge to whom the case was transferred for trial, to refrain from inquiring into the grounds for the motion.

Instead of appraising defense counsel's conduct in light of our own disciplinary rules, the opinion suggests that the procedure counsel should have followed if he knew that his client proposed to take the stand and give perjured testimony was to follow the course recommended in ¶ 7.7 of the American Bar Association: Standards Relating to the Prosecution Function and the Defense Function, *viz.,* to advise his client against testifying, but if the latter insisted, then to move to withdraw and if withdrawal were not granted, to permit the defendant to testify without direct examination and to refrain from reciting or relying upon the false testimony in closing argument to the jury. The majority cites our decisions in the *Thornton case, supra,* and in *Johnson v. United States,* D.C.App., 404 A.2d 162 (1979), as "implicit holdings" to that effect. But in neither case did this court hold that such conduct, rather than disclosure under Rule 4–101(C)(3) or (4), was the preferred course of action for a lawyer whose client presented him with such a dilemma.

In *Thornton,* we merely held compliance with Standard 7.7 did not deprive the defendant of effective assistance, and in *Johnson* that it was not the province of a trial judge to impose the Standard upon defense counsel. Moreover, it would seem obvious that when trial counsel is faced with the "dilemma" to which the opinion adverts, he should resolve it by looking to the rules of this court rather than the recommendations of a nonjudicial organization, no matter how respected.

In view of the esteem accorded the ABA Standard by the majority opinion, one further comment seems appropriate. A defense counsel who follows this recommendation sends a signal to the trial judge that in his opinion the defendant is giving perjured testimony. Thus there is some truth to the observation of the court in *Lowery v. Cardwell,* 575 F.2d 727 (9th Cir. 1978), cited with approval by the plurality, that a lawyer who complied with the first step in the

---

4. *See* DR 4–101(C)(3).

recommended ABA procedure thereby informed the trier of facts that his client's testimony was false.[5] But to say, as that court did in setting aside a conviction under collateral attack, that "if in [fact] the defendant has committed perjury . . . she does not by that falsehood forfeit her right to a fair trial" comes dangerously close to holding that a defendant in a criminal case has a right to lie. The Supreme Court has emphasized that no such right exists:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [*Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).]

We, of course, are not bound by decisions of the United States courts of appeal for the various circuits, with the exception of the holdings of the District of Columbia Circuit handed down prior to February 1, 1971.[6] Hence, it is startling to find our court adopting the rationale of a case which rests on a premise repudiated by the highest court of the nation. It is equally difficult to support some of the dicta in an opinion of the Third Circuit, upon which the majority also relies, *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 122 (1977), although the facts of that case are distinguishable from the case now before us.[7]

Unlike the plurality opinion here, *Wilcox* refrained from holding that a counsel's disclosure of an intended perjury amounted to a breach of confidence. On this point, the court remarked:

> Whether an attorney representing a defendant in a criminal case must, or indeed

may, disclose his client's intention to perjure himself is an extremely complex question which has been addressed by a number of courts and commentators. [*Id.* at 122.]

In a footnote, the only court decision cited was *State v. Henderson*, 205 Kan. 231, 468 P.2d 136 (1970), in which the Kansas Supreme Court decided that an attorney was permitted to disclose a client's intention to commit perjury. With respect to "commentators", the court added another footnote:

> *See, e. g.,* J. Michael Callan and Harris David, *Professional responsibility and the Duty of Confidentiality: Disclosure of Client Misconduct in an Adversary System*, 29 Rutgers L.Rev. 332 (1976) (disclosure should not be made since to do so would be tantamount to disclosing that the client is guilty of the crime charged); M. Freedman, *Lawyers' Ethics in an Adversary System* 3–4 (1975). *Compare, ABA Project on Standards for Criminal Justice: The Prosecution Function and the Defense Function*, Defense Function § 7.7(c) (1971) (attorney should not disclose client's intention) *with ABA Code of Professional Responsibility and Canons of Judicial Ethics*, DR 4–101(C)(3), at 17 (disclosure should be made).

It appears from an examination of these writings that the principal arguments against the duty of disclosure have been developed in Professor Freedman's "Lawyers' Ethics in an Adversary System," which asserts the inviolability of the trust of confidentiality [or attorney-client communications] under all circumstances. A well-reasoned critique of this book, however, depicts the author's "view of confiden-

---

5. In *Lowery v. Cardwell, supra,* defense counsel was apparently taken by surprise when defendant denied participation in the fatal shooting which had resulted in a murder indictment—a statement at odds with counsel's knowledge of the facts. He immediately moved to be allowed to withdraw as counsel. As a jury had been waived, thus making the judge the trier of fact, the circuit court inferred that counsel thereby tipped off the trial judge that the defendant's testimony did not merit belief.

6. *M.A.P. v. Ryan*, D.C.App., 285 A.2d 310 (1971).

7. The defense counsel in *Wilcox, supra,* who informed the trial judge that the defendant proposed to assert a false alibi on the witness stand, was unable to account for the basis of this inference, and the court held only that an attorney may not "*volunteer a mere unsubstantiated opinion* that his client's protestations of innocence are perjured." (Emphasis supplied.) We are not dealing here with any such thing as "*unsubstantiated* opinion" of counsel.

tiality as a distorted mirror of reality," [8] as it ignores or glosses over the numerous limitations upon the scope of the privilege. Disputing his thesis that the provisions of Rule 4–101(C)(3) of the Code do not require a lawyer to reveal the commission of an intended crime, the reviewer points out:

> Freedman has read the "must" language of the Code's footnote to mean "may." And his absolutist view of confidentiality in turn has required him to read the "may" language of Disciplinary Rule 4–101(C)(3) to be meaningless.
>
> Under the Code and this footnote, one might think the attorney would be obliged to exercise his discretion and disclose confidences when the client has told the attorney that, if called to the stand, he will commit the crime of perjury. Instead of offering his crabbed interpretation of Disciplinary Rule 4–101(C)(3), Freedman might have argued that a defendant's perjury in his own defense in a criminal case is a special type of crime that should not be included within the meaning of Disciplinary Rule 4–101(B)(3). Even so, the very existence of the special rights accorded a defendant whose liberties are at stake—appointed counsel, the fifth amendment privilege, jury trial, proof beyond a reasonable doubt, and others—militates against adding the right to compel counsel to allow the client to perjure himself and even ethically require the counsel to argue the client's false story to the jury. (Footnote omitted.)

While the plurality opinion here does not suggest that counsel should urge a jury to believe false testimony, its thrust would indeed compel counsel to allow his client to perjure himself.

It is interesting to note that the controversy among the commentators and the draftsmen of the Criminal Justice Standards has received the attention of the Commission appointed by the American Bar Association to revise the Code of Professional Responsibility.[9] In discussing proposed rules requiring candor of lawyers toward the tribunal if false evidence has been offered in behalf of the client, the Commission reporter observes that whether the same duty of disclosure applies to an advocate for a criminal defendant has been "intensely debated." Taking account of three different recommendations for a resolution of the dilemma confronting a lawyer when the defendant insists upon giving false testimony, the reporter makes the following comment: [10]

> Three resolutions of this dilemma have been proposed. One is to permit the accused to testify by a narrative without guidance through the lawyer's questioning. This compromises both contending principles; it exempts the lawyer from the duty to disclose false evidence but subjects the client to an implicit disclosure of information imparted to counsel. Another suggested resolution, of relatively recent origin, is that the advocate be entirely excused from the duty to reveal perjury if the perjury is that of the client. This is a coherent solution but involves several costs. It makes the advocate an instrument of deception. It would invite an unscrupulous client, under cover of the attorney-client privilege, to ask the advocate's advice in devising the most plausible perjury.
>
> The other resolution of the dilemma is that the lawyer must reveal the client's perjury. A criminal accused has a right to the assistance of an advocate, a right to testify on his own behalf, and a right of confidential communication with counsel. However, an accused should not have a right to assistance of counsel in committing perjury. Furthermore, an advocate has an obligation, not only in professional ethics but under the law as well, to avoid implication in the commis-

---

**8.** Rotunda, Book Review, 89 Harv.L.Rev. 622, 625 (1975–76).

**9.** *See* "Discussion Draft of ABA Model Rules of *Professional Conduct,*" released for comment Feb. 19, 1980, 48 U.S.L.W. No. 32; pp. 1–30.

**10.** *Id.* at 15–16.

sion of perjury or other falsification of evidence. It follows that the advocate must disclose a client's perjury if efforts to prevent commission of perjury have failed.

In my view, the grounds stated for the last resolution are compelling and call for retention of the current provisions of the Code as annotated. If the need for preventing attorney complicity in deception requires disclosure of even privileged information in a civil trial, I see no reason why the same principle should not govern the conduct of lawyers in criminal proceedings. As the majority opinion seems to hold otherwise, I respectfully dissent.

Also unpersuasive is the holding that counsel's revelation to the court was so prejudicial that the neutrality of the trial judge was fatally compromised and hence he should have recused himself and certified the case to another judge for trial. As there were no contested issues of fact in this case—appellant eventually accepting his counsel's advice against testifying—the authorities cited by the majority have little or no bearing here. The record of the trial itself, as distinguished from the preliminary colloquy at the suppression hearing, contains not one piece of evidence which would have justified acquitting appellant on either the charge of assaulting a police officer or carrying an unlicensed gun. It is therefore difficult to conceive of any way in which appellant was deprived of due process, unless the majority feels that appellant was entitled to a trial before a judge ignorant of his intention to commit perjury and therefore perhaps ready to swallow whole whatever testimony appellant chose to give in that proceeding—if indeed it may be assumed that appellant would have taken the stand in a trial before another judge.

The record discloses that the trial judge was far from prejudiced against appellant despite counsel's disclosure of his intention. At the time he was tried, appellant was in prison for conviction of a prior unrelated crime, and the two offenses for which he was convicted in this case provide for maximum terms of 10 years. Nevertheless, after imposing new prison sentences, the trial court then suspended the sentences and placed appellant on probation. Even the most unprejudiced judge could scarcely have accorded him more lenient treatment.

## APPENDIX

Before HARRIS and MACK, Associate Judges, and REILLY, Chief Judge, Retired.

Opinion for the court by REILLY, Chief Judge, Retired.

Dissenting opinion by Associate Judge MACK.

REILLY, Chief Judge, Retired:

This is an appeal from a two-count conviction in a nonjury trial for (1) assault on a police officer (D.C.Code 1973, 22–505(a)), and (2) carrying a pistol without a license (D.C.Code 1973, § 22–3204). Appellant assigns as error a denial of a pretrial motion to suppress the evidence (viz., the pistol) and also urges reversal on the ground of ineffective assistance of counsel.

Appellant's first contention, based upon an assertedly unreasonable search and seizure by the police officer who found the pistol on his person, requires only brief discussion. The confrontation which resulted in appellant's arrest occurred late one night on a city street in a block where several cars were parked. The police officer, who had previously made several arrests of persons for stealing items from automobiles in this precise location, turned off the headlights of his unmarked car as he approached the block by means of an alley.[1] He stopped the front of the car at the building line, keeping the rest of it in the alley, "and I sat there for a moment, just observed as far as I could to my left and my right." He

---

1. Asked why he had turned his lights off, the officer replied:

 If you turn into that street going to Kingman Place, the headlights show up on the fronts of the houses on the west side of the block . . . . Anybody that was perpetrating a crime would know in advance that someone was coming and usually stop, for obvious reasons.

then drove forward so that the front of his car was on the sidewalk. Suddenly he turned on the headlights. He testified: "The moment after I put on the headlights, I observed the defendant stand up from behind a parked car on the west side of the street." Appellant immediately walked away, but the officer drove abreast of him, stepped out, and asked him what he was doing. When informed by appellant that he was "just hanging around," the officer requested some identification. This was not forthcoming, and appellant gave the officer a residence address which the officer believed to be false. Appellant then started to back away, behaving suspiciously, and the officer asked him whether he was armed. Appellant replied in the negative, but as he continued to retreat, the officer told him he would pat him down. As he was attempting to do so, appellant brushed the officer's arm aside, and in the resulting scuffle, the officer felt what he "most reasonably was sure was a weapon."[2] A struggle ensued in which appellant struck the first officer several times. A second officer, arriving on the scene, helped the first one to subdue appellant and extract a pistol from his waistband.

As we have pointed out in *Thompson v. United States*, D.C.App., 368 A.2d 1148, 1150 (1977), and in numerous other cases, the right of a policeman to stop and question a person even though no probable cause for arrest exists has been sustained in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972), if the stop "is based on suspicion and supported by 'specific and articulable facts.'"

We are satisfied that in this case the court's order denying suppression was correct. Here, appellant was discovered hidden behind a parked car late at night on a block known by the officer to have been the scene of numerous prior thefts from cars. Hence a momentary detention for questioning was an obviously reasonable police response. *See, e. g., Stephenson v. United States*, D.C.App., 296 A.2d 606, 609 (1972), *cert. denied*, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973).

Once the questioning had begun, the obvious failure of appellant to provide a plausible explanation for having concealed himself behind a parked car, his uncooperative answers, and his evasive tactics, were scarcely calculated to allay the officer's original suspicions. Under these circumstances, it would have been foolhardy for the officer to have pursued his interrogation further without frisking a suspect whose behavior suggested a reasonable likelihood of his being "armed and dangerous." *See Terry v. Ohio, supra*, 392 U.S. at 30, 88 S.Ct. at 1884.

---

2. The dissent's selective and limited portrayal of the facts warrants the following quotation from the suppression hearing testimony of the arresting officer:

I stopped my vehicle, got out and approached Mr. Butler, and my first question, I just asked him what he was doing behind the car, and at this time he stated he was just hanging around. At 11 o'clock there was nobody else on the street. Popped up from behind a car. Due to the large amount of petit larcenies and other offenses occurring in that area, I was going to fill out a spot-check card police department form, and they're used to compile fingerprints. You can send them in and they compare fingerprints on petit larceny cards. Anything that might be used in that area.

I then asked the defendant for some identification, at which time he stated he didn't have any, he lost his wallet. In conversation I then asked him where he lived, and he said he lived in the 1500 block of Euclid Street, Northwest, and to the best of my recollection, he said he lived in Hilltop. To the best of my recollection, that area has been torn down or the building was vacant. At this time he became noticeably nervous, his head sort of twitched and he was staring by me as I was asking him these questions, like looking not normal, like your eyes would blink. He just looked away from me. He began to back away from me. He began to back up a little, and at this time I asked him if he had a weapon on him, and he said no, and just started moving a little backwards, and at that time I told him I was going to pat him down on the outside, and I went to reach my right arm around his back. He pushed my arm away with his left hand. Immediately, I shoved my hand further to the small of his back, where I grabbed onto the butt of what I most reasonably was sure was a weapon.

Contrary to our dissenting colleague's description of the incident, the officer's articulated grounds for suspicion rested in no way whatsoever upon the "familiar talismanic litany" that he had encountered the appellant in a "high crime area." The officer had found him concealed between parked cars on a block where so many thefts and pilferage of objects in such parked cars had previously occurred that in approaching this location, the officer had deliberately turned off his headlights in the expectation that he might well uncover a sneak thief at work. In *Terry v. Ohio, supra,* the only grounds for the disputed stop and search were that the officer had seen two men loitering in front of a retail shop and suspected, because they continued to hang around there, that they might be "casing the joint" with a view to breaking in. Had the officer in that leading case been informed that the retail shop in question had been repeatedly burgled, his justification for questioning and frisking the suspects would have been much stronger. This was the very situation which confronted the officer in the case before us.

Appellant's asserted deprivation of effective assistance of counsel presents a somewhat more novel question. In *Thornton v. United States,* D.C.App., 357 A.2d 429, cert. denied, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), we dealt with the dilemma of a defense counsel whose client, literally on the eve of trial, so changed his version of the incident for which he was to be tried that counsel could only conclude that testimony as to the new version would be not only perjurious, but counterproductive. Here, a somewhat comparable change in stories occurred, but within the context of the beginning of a pretrial suppression hearing.

Moreover, unlike what occurred in *Thornton,* appellant never did testify, either in the suppression hearing or at the trial. As we shall explain, the differences are significant.

A proper understanding of the development of the problem can best be had by quoting rather significantly from the record, rather than merely by characterizing it. As soon as the suppression hearing was called to order by the court, the following colloquy occurred:

[DEFENSE COUNSEL]: As a preliminary matter, Mr. Butler has advised me he would like to address the Court about counsel, since we haven't started the motion yet.

THE DEFENDANT: Your Honor, I don't wish [defense counsel] to represent me. I haven't secured counsel yet. If the Court would appoint me another counsel to represent me till I get my own counsel, it would be all right. I prefer that.

THE COURT: Well, [defense counsel] was previously appointed to represent you in this matter, was he not?

THE DEFENDANT: Yes, Your Honor. It seems as though I had trouble communicating with [defense counsel]. I wrote the Bar Association, the Public Defender Service and the Judge to try to communicate with [defense counsel]. I was locked up in February and I saw [defense counsel] once, in April. I didn't see [defense counsel] no more until September 9, 1975, and I really haven't had time to—rather, he hasn't had time to talk to me about my case. I understand that he's a very busy man, and I'd appreciate someone who has a little more time than he has.

By that statement, appellant clearly raised a pretrial claim of ineffective assistance of counsel. Faced with such a situation in another case, we recently stated:

When a defendant makes a pretrial challenge to the effectiveness of counsel—whether court-appointed or retained—and requests the appointment of new counsel on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance, the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations. [*Monroe v. United States,* D.C. App., 389 A.2d 811, 820 (1978) (citations omitted).]

See also *Thornton v. United States, supra* at 434–35; *Brown v. United States,* 105 U.S.App.D.C. 77, 83, 264 F.2d 363, 369 (en banc) (Burger, J., concurring), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959).

While the suppression hearing in this case was conducted eight months prior to our decision in *Thornton v. United States, supra,* and nearly three years prior to our opinion in *Monroe v. United States, supra,* the trial court proceeded to conduct precisely such an inquiry. Defense counsel explained his position in detail:

> [DEFENSE COUNSEL]: If it please the Court, I was appointed to represent Mr. Butler, I believe the 1st of February, or thereabouts. This incident occurred January 31st, so I suppose it was February 1st. I met with Mr. Butler in the cellblock and I spoke to him for at least an hour about the facts of the case. I met with him again prior to the preliminary hearing date of February 12th, 1975, and I had at least a thirty-minute conference, and I spoke with him again that day and we had a preliminary hearing in which I had an examination of the police officer. The indictment I believe, came in April. I filed a motion to suppress the evidence. That was going to be heard on the preliminary trial date in May, I believe. Your Honor, I don't object to being removed as counsel in the case, and I'd just like to state on the record that Mr. Butler has called the Public Defender Office, he has complained to the Grievance Committee and the real text of his complaint is simply he doesn't understand, in my opinion, why he's been incarcerated so long. He has a two-year back-up time on parole presently. It was my judgment not to try to get him to make $1,500 bond because I have talked to his parole officer and he is not going to be released until this matter is litigated. The evidence is such, Your Honor, that he's in violation of [his] parole even if he wins the case, because the Parole Board can determine that the defendant had a pistol on him, which is a violation of parole conditions.

> I have moved for trial all along. Judge Smith's calendar was such that he never could get a trial. We had a continuance two or three times. The last time was September 4th, and I urged that the case be heard as soon as possible because the defendant is locked up, but it was my judgment that the defendant is benefitting by being locked up the same time on the parole violation and on the $1,500 bond, because he's going to get credit eventually for the time that he's served at the jail for both violations, for the parole violation and for the pistol charge.

> The defendant is concerned that I never came down to the jail to see him for two, three, four months, and I concede I did not. I filed a motion [to suppress]. This is an open and shut case, Your Honor, where I talked for approximately two hours with the defendant, filed an appropriate motion, and there are one or two witnesses that are police officers, for the government, and this defendant's word against theirs as to an incident on the street that took about ten minutes to occur. It is not a case where you put character in evidence, because the defendant is on parole for a crime of moral turpitude, and he doesn't have an alibi because he was arrested on the scene and, to be frank, Your Honor, because I expect he wants to testify in this case, he is concerned that I do not want to put him on the stand, because he's told me before that he had the pistol, and today for the first time he tells me that's not true.

At this juncture, we digress briefly to refer to the dissenting opinion of Judge Mack which follows. While she apparently believes appellant was denied effective assistance of counsel, she makes a rather contrary observation. She states: "I do not suggest that counsel was incorrect in his assessment of the facts or less than astute in his choice of legal strategy." Nonetheless, she concludes that defense counsel "was not representing his client as an advocate."

That conclusion is manifestly contradicted by the record. Defense counsel success-

fully had negotiated a plea bargain; the government was prepared to drop the charge of assault on a police officer and agree not to allocute at the sentencing hearing if appellant were to plead guilty to the charge of carrying a pistol without a license. As the trial court's inquiry into the matter developed, appellant first agreed to such a plea; then expressed reservations and the court terminated the discussion. Prior thereto, defense counsel further reflected his problems by making the following three observations:

[DEFENSE COUNSEL]: . . . .

I have tried from the beginning [to] convince Mr. Butler that if we're successful in suppressing the pistol, then we may have a good chance with the jury on assault on a police officer; but if we're unsuccessful on suppression of the pistol, I don't see how in the world a jury or a judge could avoid convicting him of the pistol charge. That's where the quarrel lies, Your Honor.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Your Honor, I have tried to impress—It's my representation I have tried to impress upon him the fact that if he pleads to the pistol charge, which I think clearly can be proven beyond a reasonable doubt, and the government waives allocution, he has a much stronger chance for concurrent time. I tried to impress that upon him. He won't talk to me about that, and with two years back-up time that should be a prime consideration.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Your Honor, I have just tried to explain, I don't mind trying any case, but I'd rather take on the hardest murder case in the world and have a chance to win it than a simple

pistol charge, because you either have it or you don't, and I have tried to persuade the defendant, and I wouldn't be revealing these things on the record but for the fact he's accused me of ineffective assistance of counsel.

There are three basic reasons why appellant's assertion of ineffective assistance of counsel must fail. The first is that the trial judge made the following factual finding after hearing from the defendant and defense counsel:

THE COURT: The situation, Mr. Butler, is that you got to decide what you want to do [as to tendering a plea]. It's really not [defense counsel's] fault. He's done all he can under the circumstances. I think he's adequately represented your interests. I know when a case has been represented properly.

Such a type of finding, which we recently stated in *Monroe v. United States, supra* at 820, must be made by the trial court, is binding upon us unless it is "plainly wrong or without evidence to support it." [3] *See* D.C.Code 1973, § 17–305(a). Assuredly no such conclusion could be reached by us on this record.

Second, in light of the obligation of the trial court in this type of a pretrial situation "to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations," *see Monroe v. United States, supra* at 820, defense counsel as an officer of the court is obliged to acquaint the court with sufficient facts to permit an informed finding as to whether his representation has satisfied the requisite standards. Here, for counsel to have been silent as to the ultimate reason for the defendant's seeking of new counsel would have precluded the trial court from being able to properly evaluate the circumstances.[4]

3. We further noted in *Monroe v. United States, supra:*

The trial court is not required to evaluate the strategic options open to an attorney, to substitute its personal opinions for that of defense attorneys, or to otherwise engage in speculative judgments. It is required only to ascertain the concrete steps taken by counsel in preparation of the case and to evaluate

their sufficiency under the circumstances. (389 A.2d at 819.)

4. Our dissenting colleague hints that defense counsel's candid discussion of his representation of an obviously difficult client "pav[ed] the way for denial of impartiality." No such challenge to the trial judge's role was made in the trial court, nor has such an argument been

Third, any contention of a denial of effective assistance of counsel is belied by an unlikely source: our colleague's dissenting opinion. While the acknowledgment of possession of tangible evidence which is inherent in the filing of a motion to suppress is not later admissible in a trial on the merits, *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the other side of that coin has equal validity. That is, for purposes of a motion to suppress, the movant acknowledges that he did have the evidence in his possession at the time of the search and seizure which he contends to be unconstitutional.[5] Thus, while we confess to some surprise at our dissenting colleague's conclusion that the frisk of appellant's outer clothing which produced the pistol was unconstitutional, that point could not even have been presented on this record if appellant had not contended that the gun had been taken from his person impermissibly. Thus, as a consequence of defense counsel's tactical decision his able presentation of that issue at the trial level, and its related submission to us by newly-appointed appellate counsel, appellant ultimately has fallen but one vote short of prevailing on the suppression issue.

We conclude by commenting briefly upon one final aspect of the multiple ineffectiveness arguments presented by appellant. It is contended that constitutional ineffectiveness occurred through the trial judge's becoming aware of appellant's prior criminal record before the suppression hearing and, again, before trial. Such a position is wholly frivolous. Prior to the actual suppression

made in this court. We previously have noted that: "We must recognize the presumption that a trial court will disregard all irrelevant matters in making its adjudications." *In re W.N.W.*, D.C.App., 343 A.2d 55, 58 (1975); *see also Blakney v. United States*, D.C.App., 225 A.2d 654, 655 (1967). Moreover, no evidence was received in the suppression hearing that was not admissible on the trial of the two charges against appellant. *See Commonwealth v. Goodman*, 454 Pa. 358, 311 A.2d 652, 654 (1973).

Also, of course, our resolution of this case is predicated on its own factual situation. An attorney at all times is bound by the Code of Professional Responsibility (in this context, see

hearing, appellant was prepared to tender a guilty plea (although, as noted, he later changed his mind). That brought into play the provisions of Super.Ct.Cr.R. 11, subsection (c) which requires the court in a guilty plea hearing to "address the defendant personally in open court and inform him of, and determine that he understands, the following: (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; . . ." As appellant previously had been convicted of carrying a pistol without a license, and hence was subject to enhanced punishment as a repeat offender, *see* D.C.Code 1973, §§ 22–104 and 22–3204, only by having been made aware of the prior conviction could the trial court have been in a position to conduct a proper Rule 11 guilty plea proceeding.

When the case came on for trial, the parties advised the court that they had, as is customary, agreed to stipulate as to the basic facts which had been developed at the suppression hearing concerning the possession of the pistol. The court then asked defense counsel if appellant would testify. Counsel replied:

I don't believe he will. I have spoken to him this morning about that, Your Honor, the indication was that he would not. I explained the problems with the Court the last time regarding whether he was telling the truth about having the pistol. So, I reserve stating what I'll do until he gets here and let him make the

particularly DR 4–101 and DR 7–102 thereof), and the amount of information which an attorney properly may provide to the court is subject to real limitations. We simply conclude that those limitations were not exceeded here.

5. It is noteworthy that while the colloquy on assistance of counsel which preceded the suppression hearing focused in part upon appellant's apparent intention to deny having had a pistol, he repeatedly made comments reflecting his possession thereof, such as:

THE DEFENDANT: For an illegal search, Your Honor, I should get some type of consideration, from the search being illegal itself.

decision but I don't think he will take the stand.[6]

In the meantime, prior to trial, the government had filed the written information as to appellant's prior conviction for carrying a pistol without a license which was a prerequisite to an increased punishment for the offense with which he was charged. *See* D.C.Code 1973, § 23–111(a)(1). That properly was before the court, which, in the interest of efficiency, also inquired if there were other convictions which could be used for impeachment in the event the defendant testified. The government named two; defense counsel agreed they were correct. While undoubtedly it would have been preferable for the trial court not to have inquired as to other convictions, there was no objection thereto, and assuredly no action of counsel concerning this aspect of the case amounted to constitutionally ineffective assistance of counsel. (*See* note 4, *supra*.)

There being no error requiring reversal, the judgments of conviction are affirmed.

*Affirmed.*

MACK, Associate Judge, dissenting:

I respectfully dissent. In. *Monroe v. United States*, D.C.App., 389 A.2d 811, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), this court held that where a claim of ineffective assistance of counsel is raised in a pretrial context, the standard by which the competence of defense counsel is to be measured is that which is " 'within the range of competence demanded of attorneys in criminal cases.' " *Id.* at 819, *citing McMann v. Richardson*, 397 U.S. 759, 771 & n. 14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).[1] In adopting this standard, we also held that since a

claim of ineffective assistance of counsel raises a Sixth Amendment claim, the trial judge is under a constitutional duty to conduct a searching factual inquiry into the merits of defendant's allegations. *Monroe, supra* at 819.[2] This factual inquiry must be of record to permit appropriate appellate review. *Id.* at 821. We did not formulate with any degree of specificity and detail the questions that the trial court must ask in *Monroe*, but held that such an inquiry should be left to the sound discretion of the trial court. *Id.*

Upon reviewing the record in this case, I cannot agree that the conduct of appellant's defense counsel constituted effective assistance of counsel under the standard we enunciated in *Monroe*, and I can conclude only that in denying appellant's request for a new counsel, the trial court abused its discretion. ' I refer to the time of pretrial hearing, a time when defense counsel, appointed to represent appellant on a charge of assaulting a police officer and a felony count of carrying a pistol without a license,[3] announced to the judge who ultimately sat as the trier-of-fact:

This is an open and shut case, Your Honor, where I talked for approximately two hours with the defendant, filed an appropriate motion, and there are one or two witnesses that are police officers, for the government, and this defendant's word against theirs as to an incident on the street that took about ten minutes to occur. It is not a case where you put character in evidence, because the defendant is on parole for a crime of moral turpitude, and he doesn't have an alibi because he was arrested on the scene and, to be frank, Your Honor, because I expect he wants to testify in this case, he is

**6.** As noted, appellant voluntarily did not take the stand. Hence, the problem of how defense counsel should deal with what he considered to be potential perjury simply never materialized.

**1.** The degree of competence of defense counsel under the *Monroe* standard at pretrial is significantly higher than the standard by which defense counsel's competence is measured in a post-trial claim of ineffective assistance of counsel. *See Angarano v. United States*, D.C.

App., 312 A.2d 295 (1973), *petition for rehearing denied* (en banc), 329 A.2d 453 (1974).

**2.** Our holding in *Monroe* was recently reaffirmed by this court in *Farrell v. United States*, D.C.App., 391 A.2d 755 (1978).

**3.** The charge of carrying a pistol without a license was a felony by virtue of a previous conviction for the same offense.

concerned that I do not want to put him on the stand, because he's told me before that he had the pistol, and today for the first time he tells me that's not true.

By expressing his personal views as to the merits of the facts and the legitimacy of available defenses before the judge who ultimately sat as the trier-of-fact, appellant's counsel failed to adequately represent his client under the standard we set forth in *Monroe*. For the trial court to have disregarded the impact of counsel's prejudicial conduct was error of constitutional dimension.

The trial court bears a significant responsibility in assessing and evaluating the merits of an ineffective assistance of counsel claim. When an accused alleges inadequate representation, the trial court must not only undertake a thorough factual inquiry as to the substance of defendant's complaint, but also must determine as a matter of law on the basis of those facts whether defense counsel's conduct and performance comports with the mandate of the Sixth Amendment. In making that determination the trial judge must evaluate the facts carefully and be certain that his legal conclusion is fundamentally sound.[4] When appellant's defense counsel made highly prejudicial statements concerning his client and later without objection permitted his client to go to trial before the same judge, counsel did not exhibit that professional competence which is " 'within the range of competence demanded of attorneys in criminal cases,' " *Monroe, supra* at 816 *quoted* in *McMann v. Richardson*, 397 U.S. 759, 771 & n.14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), and the trial court should have granted appellant's request for new counsel.

However, in the circumstances of this case, the issue is not so much whether the appellant has had effective assistance of counsel in the traditional sense, as whether he has had assistance of counsel at all in the constitutional sense at a critical point that shaped his fate in derogation of any meaningful right to trial. I cannot read the statement of counsel at pretrial hearing and conclude that this is the assistance of counsel contemplated by the Sixth Amendment. That amendment, the Supreme Court has said, was intended to do away with the common law limitation of assistance of counsel to matters of law and excluding matters of fact. *See United States v. Wade*, 388 U.S. 218, 224–25, 87 S.Ct. 1926, 1930–31, 18 L.Ed.2d 1149 (1967). And here, whatever the competence of counsel as a lawyer and his choice of legal strategy, the fact is that he was not representing his client as an advocate.[5]

The Supreme Court (in the context of an appellate case) has specifically noted that constitutional requirements of substantial equality and fair process mandate that appointed counsel act in the role of an active advocate in behalf of his client as opposed to that of *amicus curiae*. *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967). In like vein, this jurisdiction has recognized that indigents are entitled to representation by counsel acting "not as a passive friend of the court, but as a diligent, conscientious advocate in an adversary process." *Tate v. United States*, 123 U.S.App.D.C. 261, 269, 359 F.2d 245, 253 (1966). *See also United States v. Hammonds*, 138 U.S.App.D.C. 166, 170, 425 F.2d 597, 601 (1970); *Johnson v. United States*, 124 U.S.App.D.C. 29, 360 F.2d 844 (1965).

---

4. I am somewhat puzzled by the majority's statement that the factual finding that the trial court must make in carrying out the mandate of this court's decision in *Monroe* "is binding upon us unless it is 'plainly wrong or without evidence to support it.' " It is fundamental that a claim of ineffective assistance of counsel is a claim of constitutional dimension and that after the trial court makes a factual finding as to a defendant's allegations of ineffective assistance of counsel, the trial court must determine *as a matter of law* whether a defendant's allegations amount to a Sixth Amendment deprivation. Such a legal conclusion is always reviewable by this court *de novo*.

5. My sentiments are at least shared by appellant (or is it the other way around?). Thus appellant, in immediately denying at the pretrial hearing that he had told counsel he had a pistol, added,

And by you supposed to be representing me, you ain't supposed to make no statements such as that anyway.

But there is even more at issue here than effective assistance of counsel or a nonadversary approach by counsel. In a single comment (with repetitions in a similar vein)[6] counsel has revealed his client's confidences and secrets by communicating to the court (and ultimately the trier-of-fact) his personal views as to the merits of the facts and any possible defense, placed the credibility of his client in question and indicated that his client might have the intent to commit perjury—all matters raising serious ethical considerations suggesting prima facie prejudice to his client as well as a violation of a lawyer's responsibility to preserve the confidences of his client. *See* ABA Code of Professional Ethics No. 37 (1968).

The majority, in holding that there is no merit to appellant's ineffective assistance of counsel claim and thereby approving of counsel's conduct in this case, advances *Monroe, supra,* as support for its position. However, there exists no language in *Monroe* which suggests or even implies that the trial court in evaluating a pretrial ineffective assistance of counsel claim is to inquire into counsel's views as to the merits of the facts and any possible defense or is to inquire into any confidences between attorney and client. To the contrary, in *Monroe,* we stated that "[a] trial court's primary duty under the Sixth Amendment when confronted with a pretrial claim of inadequate preparation and consultation is to decide whether counsel has consulted with the defendant and prepared his case in a proper manner." *Id.* at 819. In the instant case the trial court appeared to initiate precisely such a factual inquiry as required by our decision in *Monroe.* However, appellant's counsel in responding to the trial court's inquiry volunteered information that was not only highly prejudicial, but

irrelevant to the trial court's determination of appellant's ineffective assistance of counsel allegation. Counsel's duties to the trial court would have been satisfied had he confined his statements to the steps he had taken in preparing appellant's case and the extent to which he had consulted with appellant prior to the pretrial hearing. Appellant's counsel (as is the majority) was apparently under the misconception that a pretrial factual inquiry into the merits of an ineffective assistance of counsel complaint is analogous to a post-conviction proceeding or disciplinary hearing where the Code of Professional Responsibility permits counsel to make certain disclosures.[7] But this court has never held that a pretrial hearing into the merits of an ineffective assistance of counsel allegation is the type of proceeding where counsel may disregard his duty to guard his client's confidences and secrets. And under the circumstances of this case where the accused raised a timely pretrial claim of ineffective assistance of counsel and was merely stating his reasons for desiring new counsel, defense counsel overreacted prematurely, going far beyond the extent necessary to respond to the defendant's allegations.

By explicitly approving the conduct of appellant's defense counsel, the majority not only distorts the meaning and purpose of *Monroe,* but in effect presents defendants with Hobson's Choice. The logical implications of the majority's reasoning is that if a defendant raises an ineffective assistance of counsel claim, he must run the risk that his attorney will reveal confidential information that may prejudice his case. Faced with such an untenable choice, many defendants with legitimate ineffective assistance of counsel claims will no doubt forego their constitutional right to assert such claims. I do not believe that the Sixth Amendment contemplates such a result.

---

**6.** Counsel underlined his original remark by shortly thereafter adding, "I have explained to the defendant, Your Honor, that I cannot put him on the stand if I think he's committing perjury, without telling the Court." Also, at the time of trial but before appellant had arrived, counsel repeated "I have explained the problems with the court the last time regarding

whether or not he [appellant] was telling the truth about the pistol."

**7.** Appellant's counsel stated to the trial court "I wouldn't be revealing these things on the record but for the fact he's accused me of ineffective assistance of counsel."

Beyond the effect the majority's ruling will have in deterring defendants from asserting their constitutional right to effective assistance of counsel, the majority's ruling will have a dramatic effect on the ability of this court to review ineffective assistance of counsel claims. If defendants, fearing that counsel will volunteer confidential information in ineffective assistance of counsel proceedings, refrain from asserting such claims pretrial, such claims will continue to be raised collaterally, and on review this court will again have to evaluate the merits of such claims by hindsight. However, the responsibility of evaluating the merits of an ineffective assistance of counsel allegation belongs in the first instance to the trial court. As this court observed in *Monroe* :

> A defendant's assertion of a pretrial claim of ineffectiveness presents the trial judge with the opportunity to take steps to eliminate any deficiencies in the representation of counsel before the resources of the judicial system have been invested in a full-blown trial. . . . The disposition of such claims, raised pretrial, may serve as an alternative to the traditional post-conviction focal point for control of the quality of defense advocacy, and may serve to minimize or expedite the disposition of the number of ineffective assistance claims. [*Id.* at 818–19.]

I am fully aware that in addition to post-conviction proceedings and disciplinary hearings another well-recognized exception to the obligation of confidentiality is that a lawyer *may* disclose—indeed may be obligated to disclose his client's stated intention to commit a crime. Perjury of course is a crime and the principle of confidentiality would never require that a defense attorney acquiesce in the use of known perjured testimony. Specific disciplinary rules prohibit such conduct. I would point out, however, that a defense attorney who has reason to believe that a client intends to commit perjury in a pending case is in a different posture from one who has reason to believe, for example, that the client will commit a crime of larceny.

In the former circumstances, counsel is required to make a personal assessment as to truth or falsity, guilt or innocence in the case which counsel is pledged to defend. Extreme caution is required in this regard. The course of conduct which counsel pursues may have profound implications with respect to the possibility of a fair trial for the client. Counsel's premature speculation at the pretrial stage as to a client's intent to commit perjury is quite different from a defense counsel's certainty at trial that the client does intend to commit perjury, for at trial the possibility of perjury is no longer mere speculation but quite imminent.[8]

---

8. I do not mean to suggest that a defense counsel upon learning at trial that his client has committed or intends to commit perjury does not owe his client a duty to guard his confidences, for even at this stage of criminal proceedings defense counsel's disclosures may deprive his client of a fair trial. For example, in *Lowery v. Cardwell*, 575 F.2d 727 (9th Cir. 1978), it was held that defense counsel who during the course of a trial without a jury attempted to withdraw because he believed that his client had committed perjury, had by such conduct so prejudiced his client's case as to deny her a fair trial:

> The problem presented is that which arises when defense counsel, in the course of a criminal trial, forms the belief that his client's defense is based on false testimony. We start with the basic proposition that if, under these circumstances, counsel informs the fact finder of his belief he has, by that action, disabled the fact finder from judging the merits of the defendant's defense. Fur-

ther, he has by his action openly placed himself in opposition to his client upon her defense. The consequences of such action on the part of counsel, in our judgment, are such as to deprive the defendant of a fair trial. If in truth the defendant has committed perjury (a fact we do not know in this case) she does not by that falsehood forfeit her right to fair trial. [*Id.* at 730.]

It is important to note that in *Cardwell*, defense counsel did not make any verbal disclosures of his client's confidences before the judge who sat as the trier-of-fact. Rather the court found that by merely attempting to withdraw, defense counsel had communicated to the judge who sat as the trier-of-fact his belief that his client had committed perjury and had by such conduct prevented the trier-of-fact from impartially assessing the merits of the case. In the case at bar, appellant's counsel went far beyond the conduct of defense counsel in *Cardwell* by prematurely raising the issue of

However, in either case, defense counsel's determination as to whether disclosure should be made requires caution and prudence since a revelation without resort to other alternatives may make the possibility of a fair trial well nigh impossible. In this regard, a privately retained lawyer is in a better position than appointed counsel to persuade or to withdraw. In the District of Columbia, where so many indigent defendants are represented by appointed counsel or the Public Defender Service, the ABA Standards for the Defense Function offer the needed guidance.

These standards draw a distinction between perjury and other crimes. Thus pursuant to ABA Standard 3.7, a lawyer may reveal the expressed intention of his client to commit a crime except as provided in Standard 7.7. Standard 7.7, which we have not adopted but which we have described in Thornton v. United States, D.C.App., 357 A.2d 429, 437 n.14 (1976), as having content "eminently sound," sets forth the successive steps that counsel should take to avoid perjurious testimony. These include giving advice against such course, seeking leave to withdraw, recording that the client is taking the stand against advice of counsel without revealing the fact to the court, confining examination to identifying the defendant, thus permitting him to make his own statement, and refraining from direct examination or argument relating to the false testimony.

These standards were followed by counsel in Thornton, supra. While in that case we held that it was error for the trial court not to have ascertained counsel's reasons for wanting to withdraw, we note that there counsel was retained and that trial was had before a jury.[9]

In the instant case, appointed counsel prematurely raised the spectre of perjury and immoral conduct at the pretrial stage, stated his view of the facts and the law, subsequently advised his client to waive a jury trial, and permitted his client to go to trial before the same judge who sat at pretrial.[10] I do not suggest that counsel was incorrect in his assessment of the facts or less than astute in his choice of legal strategy. But the duty of defense counsel is to represent—even when he cannot win—to be the professional voice upon which his client may rely with confidence and to hold his client's interest and information in trust. See ABA Standards, supra. When counsel, in his own interest, exposes the trier-of-fact to prejudicial material, he is departing from his role as an advocate and paving the way for denial of impartiality. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

In assessing similar but less serious conduct, Judge Hufstedler of the Ninth Circuit has observed:

his client's intent to commit perjury at the pretrial stage before the judge who eventually sat as the trier-of-fact. In so doing, he subordinated his client's interest to his own. ABA Code of Professional Responsibility, Canon 5.

9. Chief Justice Warren Burger, a staunch advocate of a lawyer's duty to disclose his client's intent to commit perjury, has recognized that different considerations are present where such disclosures are made before a judge sitting as the trier-of-fact than where a jury sits as the trier-of-fact. In setting forth his views as to the proper method of dealing with a client who intends to commit perjury and insists on taking the stand, [then Circuit Judge] Burger stated:

If in those circumstances the lawyer's immediate withdrawal from the case is either not feasible, or if the judge refuses to permit withdrawal, the lawyer's course is clear. He may not engage in direct examination of his

client to facilitate known perjury. He should confine himself to asking the witness to identify himself and to make a statement, but he cannot participate in the fraud by conventional direct examination. Since this informal procedure is not uncommon with witnesses, there is no basis for saying that this tells the jury the witness is lying. A judge may infer that such is the case but lay jurors will not. [Burger, Standards of Conduct: A Judge's Viewpoint, 5 Am.Crim.Law Q. 11, 13 (1966) (emphasis added).]

10. Counsel did in fact persuade appellant not to testify and he presented no witnesses. Much of the government's testimony developed at the pretrial hearing was stipulated to, a motion for judgment of acquittal on the assault charge was denied, and defense counsel expressed again his opinion that the case would turn on the suppression issue.

Despite counsel's ethical concerns, his actions were so adverse to petitioner's interest as to deprive [her] of effective assistance of counsel. No matter how commendable may have been counsel's motives, his interest in saving himself from potential violation of the canons was adverse to his client, and the end product was his abandonment of a diligent defense. [*Lowery v. Cardwell*, 575 F.2d 727, 732 (9th Cir. 1978) (Hufstedler, J., concurring) (citations omitted).]

I believe reversal is mandated because of ineffective assistance of counsel as well as on another ground.

## II.

We need to be reminded that a "stop and frisk" *is* a search and seizure within the meaning of the Fourth Amendment and must therefore satisfy constitutional standards of reasonableness. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). As the majority recognizes, the stop must be supported by "specific and articulable facts." I would add that any search conducted by an officer must be a limited one for weapons and is justified only if the officer observes unusual conduct which leads him to conclude (1) that criminal activity may be afoot and (2) that the person he is dealing with may be armed and presently dangerous. *Id.* at 30, 88 S.Ct. at 1884.

The "articulable facts" here upon which the officer based his conclusion that a search was warranted are that the appellant rose from behind a parked car and walked down a street in a high crime area at 11:00 p. m., when stopped could not produce identification, gave an address which the policeman incorrectly believed was false, and became noticeably nervous upon continued questioning. In my view, these facts support neither a conclusion that criminal activity was afoot, nor that appellant was armed and presently dangerous. The officer himself confirmed that the only "suspicious" thing he saw the appellant do was to stand up from behind a parked car when the officer turned on his headlights. The facts equally support the inference that the appellant may have crouched in fear behind a parked car when he saw an unmarked, dark-colored cruiser with its lights extinguished moving slowly down a dark alley and pulling onto the sidewalk, and that appellant stood only when the officer turned on his lights and became identifiable. Significantly, at that point appellant did not run or make any furtive movements but walked toward the nearest intersection, where he was followed and stopped by the police officer. And certainly increasing nervousness is not an abnormal reaction to being followed and questioned by a police officer.

With respect to the lateness of the hour and the fact that this was a high crime area, these factors have been held, by themselves, not to be conclusive as to the justification for a stop and frisk. This court has stated that it eschews the notion that "facts assume added significance because they happen to have occurred in a high crime area. This familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct." *Curtis v. United States*, D.C.App., 349 A.2d 469, 472 (1975). *See Kenion v. United States*, D.C.App., 302 A.2d 723 (1973).[11] "It may be that presence on the streets of this city at an early hour in the morning is suspicious . . . but something more than that is required to justify police detention and interrogation."

11. In *Curtis v. United States, supra*, where a man and a woman were seen walking down an alley at about 7:20 p. m., in an area which had an unusually high number of homicides and considerable narcotics activity, the court found that the fact that an unidentified third person yelled "police officers," and the appellant made a motion with his hand, was insufficient to justify a search.

In *Kenion v. United States, supra*, sighting three people gathered in an alley in a high crime area in poor weather, one of whom the police officer believed he had seen before in connection with narcotics and robbery, did not give the officer a reasonable basis upon which to conduct a frisk.

*Robinson v. United States*, D.C.App., 278 A.2d 458, 459 (1971).[12] Here the "something more" was lacking. The officer had no report of criminal activity. *Cf. Davis v. United States*, D.C.App., 284 A.2d 459 (1971) and *United States v. Frye*, D.C.App., 271 A.2d 788 (1970). Appellant was not running. *Cf. Stephenson v. United States*, D.C.App., 296 A.2d 606 (1972). Whatever inference may be drawn from his rather undignified posture is dissipated because of the likewise unorthodox approach of the officer. When approached, appellant did not refuse to answer questions nor was there a visible weapon nor bulge which would be suspected to be a weapon. *Cf. Stephenson, supra; United States v. Lee*, D.C.App., 271 A.2d 566 (1970). I have found no other case in this jurisdiction which has upheld a stop and frisk on such scant facts.

A frisk must be based on the officer's reasonable apprehension of a need for protection. The Supreme Court has condemned its use to fish for evidence noting "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

The police officer here failed to meet both parts of the *Terry* test. In my opinion the stop and frisk violated the protection of the Fourth Amendment against unreasonable intrusion, and the gun seized as a result of the illegal search should have been suppressed.[13]

---

12. In *Robinson v. United States, supra*, the police officers could not search the leather pouch which hung from the appellant's belt where they had no complaint or report of a crime in the area, had never seen appellant before, and had not observed him engaged in unlawful conduct.

13. *See Gray v. United States*, D.C.App., 292 A.2d 153 (1972).